UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 11-22602-CIV-ALTONAGA/Simonton

**BURGER KING CORPORATION**,

    Plaintiff,

vs.

**JOHN Q. HUYNH**, *et al.*,

    Defendants.
_____/

## ORDER

**THIS CAUSE** came before the Court upon the Plaintiff, Burger King Corporation's ("BKC['s]") Motion for Default Final Judgment Against Defendants ("Motion") [ECF No. 23], filed on October 26, 2011. A Clerk's Default [ECF No. 11] was entered against Defendants, John Q. Huynh ("Huynh"), Parvez M. Sheikh ("Sheikh"), and Ahoa Group, Inc. ("Ahoa") (collectively "Defendants"), on September 12, 2011, as they failed to appear, answer, or otherwise respond to the Complaint [ECF No. 1], despite having been served. (*See* Clerk's Default; Affs. of Serv. [ECF Nos. 5, 6, 8]). The Court has carefully considered the Motion, the record and the applicable law.

### I. BACKGROUND[1]

This case involves claims of federal and Florida common law trademark infringement, federal false designations, Florida common law unfair competition, and breaches of the following contracts: (a) franchise agreements; (b) personal guaranty agreements; and (c) a

---

[1] *See Priestley v. Headminder, Inc.*, 647 F.3d 497, 505 (2d Cir. 2011) (considering a motion for default judgment requires the court to accept as true a plaintiff's well-pleaded factual allegations); *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (same).

limited license agreement.

Plaintiff, a Florida corporation, operates and franchises restaurants throughout the world. (*See* Compl. ¶¶ 2, 6). For many years, "BKC has extensively employed, caused to be advertised and publicized throughout the United States certain distinctive symbols as trademarks and service marks" ("BKC Marks"). (*Id.* ¶ 17). BKC operates and franchises its restaurants using the Marks "on signs, menu boards, posters, translights, uniforms, plates, cups, tray liners and other items and in advertising to the public through television, radio and print media and the internet." (*Id.* ¶ 18).

The following is an abbreviated listing of the BKC Marks registered in the United States Patent and Trademark Office:

| Trademark | Registration No. | Registration Year |
| --- | --- | --- |
| HOME OF THE WHOPPER | 0782990 | 1965 (renewed through 2015) |
| BURGER KING | 0869775 | 1969 (renewed through 2019) |
| WHOPPER | 0899775 | 1970 (renewed through 2020) |
| BURGER KING logo | 0901311 | 1970 (renewed through 2020) |
| BURGER KING logo | 1057250 | 1977 (renewed through 2017) |
| WHOPPER JR. | 1062368 | 1977 (renewed through 2017) |
| BURGER KING | 1076177 | 1977 (renewed through 2017) |
| HAVE IT YOUR WAY | 1081348 | 1978 (renewed through 2018) |
| CROISSAN'WICH | 1550398 | 1989 (renewed through 2019) |
| CHICKEN TENDERS | 1785694 | 1993 (renewed through 2013) |
| BURGER KING Crescent Logo | 2428846 | 2001 (renewed through 2021) |

"The registrations of the BKC Marks are currently in full force and effect and BKC has given

notice to the public of the registration" of these Marks. (*Id.* ¶ 20). BKC grants its franchisees, including Defendants, a limited license and authority to use and display the BKC Marks, subject to express authorization by BKC. (*See id.* ¶ 21).

Defendant Ahoa, a California corporation, owned and operated the following two Burger King restaurants: (1) Restaurant No. 4961, located at 1908 Avenida De Los Arboles, Thousand Oaks, California 91362; and (2) Restaurant No. 10205, located at 245 N. Moorpark Road, Suite B, Thousand Oaks, California 91360. (*See id.* ¶¶ 30–31). Each restaurant is governed by a Franchise Agreement (collectively the "Franchise Agreements"). (*See id.* ¶ 30). The Franchise Agreements required Ahoa "to make monthly payments to BKC for royalties, advertising and other fees." (*Id.* ¶ 32). In particular, Ahoa was obligated to pay BKC a certain percentage of gross sales for the preceding calendar month. (*See id.*). Per the Franchise Agreements, all royalty and advertising payments were to be payable to BKC in Miami, Florida. (*See id.*). Consequently, "failure to make such payments constitutes an act of default under the Franchise Agreements." (*Id.*). In addition, Defendants Huynh and Sheikh "jointly and severally, unconditionally and irrevocably personally guaranteed to BKC the performance of each and every obligation of Ahoa." (*Id.* ¶ 33).

The Franchise Agreements contain provisions establishing the parties' rights and obligations in the event of default. (*See id.* ¶ 34). "[F]ailure to comply with any provision of the Franchise Agreements is a default of the Franchise Agreements." (*Id.* ¶ 35). Defendants are given an opportunity to cure the default. (*See id.*). Nonetheless, per the Franchise Agreements, "if an act of default occurs and Defendants fail to cure the default after any required notice and within the cure period applicable, BKC may, at its option and without prejudice to any other rights or remedies . . . terminate the Franchise Agreements." (*Id.*).

In April 2008, BKC required that Defendants "purchase and install certain POS Systems by December 31, 2009."[2] (*Id.* ¶ 39). The POS Systems "provide a consistent base of information allowing for better product sales analysis and more effective product and promotion activities." (*Id.*). Defendants did not install the required POS Systems by December 31, 2009. (*See id.* ¶ 40). Thus, Defendants were not using equipment approved by BKC, as required by the Franchise Agreements. (*See id.*).

On January 13, 2010, BKC informed Defendants "that they were in default of their obligations" and demanded that Defendants cure the defaults within the applicable time period detailed in the Franchise Agreements. (*Id.* ¶ 41; Mot. ¶ 23). Defendants never cured the defaults. (*See* Compl. ¶ 42).

Thereafter, BKC notified Defendants via letter that the Franchise Agreements were terminated, effective as of 11:59 p.m. on February 16, 2010. (*See id.* ¶ 43). Notwithstanding the termination letter, BKC and Defendants entered into a Limited License Agreement, dated March 9, 2010, allowing Defendants to continue operating the restaurants for a brief time while attempting to sell them. (*See id.* ¶ 44). In the Limited License Agreement, Defendants acknowledged, agreed and confirmed the Franchise Agreements were terminated effective February 16, 2010. (*See id.* ¶ 45). The Limited License Agreement terminated on March 31, 2011. (*See id.* ¶ 47).

Defendants did not timely sell the two Burger King restaurants. (*See id.* ¶ 49). In fact, they failed to close the restaurants and comply with post-termination obligations[3] under the

---

[2] Plaintiff refers to BKC's "2008 POS Technology Policy[,]" but Plaintiff does not describe the meaning of "POS." (Compl. ¶ 39).

[3] Terminated franchisees are prohibited from identifying themselves as current or former Burger King Franchisees, using trade secrets, promotional materials, or the BKC Marks. (*See id.* ¶ 51). Further, they

Franchise Agreements. (*See id.*). To date, Defendants have not paid BKC past-due amounts under the Franchise Agreements and the Limited License Agreement. (*See id.* ¶ 50). Nor have they returned their OPS Manual and other operational manuals, as required by the Franchise Agreements. (*See id.* ¶ 53).

Plaintiff claims Defendants' continued use of the BKC Marks "has caused or is likely to cause mistake, confusion, or deception in the minds of the public." (*Id.* ¶ 55). Moreover, BKC no longer sponsors or endorses the restaurants, or the products and services provided therein. (*See id.* ¶ 56). As a result, "BKC has suffered damages, in an amount presently unknown yet substantial." (*Id.*). In addition, because the restaurants are no longer under BKC's control and supervision, BKC contends it will suffer immediate and irreparable harm, notably in terms of goodwill and reputation, if Defendants' use of the BKC Marks is not immediately enjoined. (*See id.* ¶ 58). Furthermore, "Defendants' sale of products and services under the BKC Marks at the Restaurants poses an immediate threat to the distinct, exclusive image BKC has created at great expense for its franchisees." (*Id.* ¶ 59).

In the present Motion, Plaintiff asks the Court to enter a judgment by default and a permanent injunction, and grant equitable relief and the award of attorneys' fees in favor of Plaintiff and against Defendants. (*See* Mot. p. 18).

## II.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 55(b)(2), the Court is authorized to enter a final judgment of default against a party who has failed to plead in response to a complaint. "'[A] defendant's default does not in itself warrant the court entering a default judgment.'" *DIRECTV, Inc. v. Huynh*, 318 F. Supp. 2d 1122, 1127 (M.D. Ala. 2004) (quoting *Nishimatsu*

---

are required to remove signs "so as to effectively distinguish the building and premises from its former appearance and from any other Burger King® Restaurant." (*Id.*).

*Constr.*, 515 F.2d at 1206). Granting a motion for default judgment is within the trial court's discretion. *See Nishimatsu*, 515 F.2d at 1206. Because the defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law, the court must first determine whether there is a sufficient basis in the pleading for the judgment to be entered. *See id.*; *see also Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) ("[L]iability is well-pled in the complaint, and is therefore established by the entry of default . . . .").

### III. ANALYSIS

Plaintiff's Complaint contains seven claims for relief, all of which are alleged against Defendants. The Court will first consider Defendants' liability under each claim, and with any surviving claims, discuss what relief Plaintiff is afforded.

#### A. Liability

##### 1. Count I — Lanham Act Infringement

Under the Lanham Act, a defendant is liable for trademark infringement if, without consent, he "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services" which "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Accordingly, to prevail on a trademark infringement claim, a plaintiff must demonstrate: (1) plaintiff's mark has priority; (2) defendant used plaintiff's mark in commerce; and (3) defendant's mark is likely to cause consumer confusion. *See Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997); *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300–01 (11th Cir. 2001). Here, Plaintiff's allegations satisfy these three elements and therefore establish Defendants' liability for federal trademark infringement.

First, Plaintiff's Marks have priority as Plaintiff has used the BKC Marks for decades and has federal registration rights in those Marks. (*See* Compl. ¶¶ 19–20). The BKC Marks have become identifiers of Plaintiff and its business throughout the United States. (*See id.* ¶ 17). In contrast, Defendants began using Plaintiff's marks in 2006.[4] (*See id.* ¶ 31).

Second, Defendants have used the BKC Marks in commerce in connection with their two Burger King restaurants. It is well-known that BKC's products bearing the BKC Marks are sold in interstate commerce. (*See id.* ¶ 22). Under the terms of the Franchise Agreements, BKC allows its franchisees, such as Defendants, to use and display the BKC Marks in connection with its restaurants. (*See id.* ¶ 21). But "[i]n no event is a franchisee authorized to use the BKC Marks after the expiration or termination of its franchise." (*Id.*). Here, BKC alleges Defendants are using the BKC Marks in commerce after the Franchise Agreements have expired. (*See id.* ¶ 49). Thus, Plaintiff meets the second element of a trademark infringement claim.

Lastly, Plaintiff's allegations demonstrate the BKC Marks used by Defendants in operating their restaurants are likely to cause consumer confusion. (*See id.* ¶¶ 54–55). In assessing whether or not a likelihood of consumer confusion exists, courts in the Eleventh Circuit generally consider the following seven factors: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets (trade channels) and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion. *See Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

Here, a labored analysis of these factors is unnecessary because the BKC Marks used by Defendants are not just similar, they are *one and the same* — BKC expressly authorized the use

---

[4] The dates of the Franchise Agreements for Restaurants No. 4961 and No. 10205 are June 12, 2006 and November 6, 2006, respectively. (*See* Compl. ¶ 31).

of *its* Marks while Defendants' restaurants were validly operating. (*See* Compl. ¶ 21). The Complaint does not suggest Defendants are using symbols or slogans *similar* to the BKC Marks; rather, it states that Defendants are displaying the actual BKC Marks themselves. (*See id.* ¶¶ 17–32).

As a result, the Court agrees with Plaintiff that Defendants' use of the BKC Marks is likely to cause the public to mistakenly believe Defendants' restaurants are sponsored by, or are in some way affiliated with, Plaintiff. Therefore, the Court concludes Plaintiff is entitled to default judgment on Count I of the Complaint.

### 2. Count II — Lanham Act False Designation

The test for liability for false designation of origin under 15 U.S.C. § 1125(a) is the same as for a trademark counterfeiting and infringement claim — *i.e.*, whether the public is likely to be deceived or confused by the similarity of the marks at issue. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992). As discussed, consumers are likely to be confused by Defendants' use of the BKC Marks. Accordingly, since the test for trademark infringement is the same as for false designation, Plaintiff is entitled to default judgment on Count II.

### 3. Count III — Common Law Trademark Infringement

"The analysis of liability for Florida common law trademark infringement is the same as under the Lanham Act." *PetMed Express, Inc. v. MedPets.Com, Inc*., 336 F. Supp. 2d 1213, 1218 (S.D. Fla. 2004) (citing *Gift of Learning Found., Inc. v. TGC, Inc.,* 329 F.3d 792, 802 (11th Cir. 2003)). Therefore, Plaintiff is entitled to default judgment on Count III, for common law trademark infringement.

#### 4. Count IV — Common Law Unfair Competition

For a plaintiff to prevail on a Florida common law unfair competition claim, it

> must prove (1) the plaintiff is the prior user of the trade name or service mark, (2) the trade name or service mark is arbitrary or suggestive or has acquired secondary meaning, (3) the defendant is using a confusingly similar trade name or service mark to indicate or identify similar services rendered (or similar goods marketed) by it in competition with plaintiff in the same trade area in which plaintiff has already established its trade name or service mark, and (4) as a result of the defendant's action or threatened action, consumer confusion as to the source or sponsorship of the defendant's goods or services is likely.

*PetMed*, 336 F. Supp. 2d at 1219 (citation omitted).

Here, Plaintiff has established these elements. First, as indicated, Plaintiff is clearly the prior user of the BKC Marks as it began using the registered marks as early as 1965, decades before Defendants. (*See* Compl. ¶¶ 19, 31). Second, the BKC Marks are suggestive because years of "advertising, promotion and publicity" have made the public understand that "[t]he products and services associated with the BKC Marks are . . . produced, marketed, sponsored, supplied by and/or affiliated with BKC." (*Id.* ¶ 24). Third, Defendants are using Plaintiff's systems, names, service marks, and trademarks. (*See id.* ¶ 30). Thus, the Court concludes the marks are similar (because they are the same). Finally, Plaintiff's allegations establish that consumer confusion as to the source or sponsorship of Defendants' services is likely to result from Defendants' conduct. (*See id.* ¶¶ 54–55).

Accordingly, Plaintiff is entitled to default judgment on Count IV.

#### 5. Breach of Contracts

##### a. Count V — Breach of Franchise Agreements (Against Ahoa)

Plaintiff alleges Defendant Ahoa breached the Franchise Agreements for a myriad of reasons, including failure to close the restaurants and not complying with post-termination

obligations. (*See id.* ¶¶ 49–53, 70). "[U]nder Florida law, franchise agreements are considered personal service contracts." *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1506 (S.D. Fla. 1995) (citing *Burger Chef Sys., Inc. v. Burger Chef of Fla., Inc.*, 317 So. 2d 795, 797 (Fla. 4th DCA 1975)). To state a claim for breach of contract a plaintiff must allege: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.,* 985 So. 2d 56, 58 (Fla. 4th DCA 2008)).

First, Ahoa's two Burger King restaurants are governed by two written Franchise Agreements. (*See* Compl. ¶¶ 30–31). Second, Ahoa materially breached the Franchise Agreements by: (a) failing to install certain POS Systems; (b) failing to timely sell the restaurants; (c) failing to comply with post-termination obligations; (d) failing to pay past due royalty, advertising and other receivables; (e) holding out to the public as operating genuine and authorized Burger King restaurants after the Franchise Agreements terminated; (f) continuing to use the BKC Marks; and (g) failing to return an OPS Manual and other operational manuals. (*See id.* ¶¶ 38–39, 49–53, 70–76).

Finally, Plaintiff alleges damages. BKC contends Defendants owe $9,592.90 for attorneys' fees and costs. (*See* Mot. ¶ 66; Decl. of Nina Greene ¶ 13 [ECF No. 23-2]). Plaintiff also alleges "Defendants still owe BKC past due amounts under the Franchise Agreements and Limited License" Agreement.[5] (Compl. ¶ 50). Finally, Plaintiff complains it has suffered reputational and goodwill damages for Ahoa's continued display of the BKC Marks and other items associated with the Burger King name "in an amount presently unknown yet substantial."

---

[5] Plaintiff also seeks $64,048.99, comprised of past due royalties, investment spending and advertising. (*See* Mot. ¶ 65; Decl. of Julie Hammon ¶¶ 11–12 [ECF No. 23-1]). As explained below, this amount is unsubstantiated.

(*Id.* ¶¶ 55–56). Taken as true — which the Court must do for purposes of this Motion — Plaintiff has properly alleged damages. In sum, BKC has met all three elements for a breach of contract claim.

Therefore, default judgment against Ahoa on Count V is appropriate.

### b. Count VI — Breach of Guaranties (Against Huynh and Sheikh)

Plaintiff also alleges Huynh and Sheikh breached their guaranty agreements. Huynh and Sheikh, in writing, "jointly and severally, unconditionally and irrevocably personally guarantied to BKC the performance of each and every obligation of Ahoa . . . under the Franchise Agreements." (*Id.* ¶¶ 33, 82). BKC contends that because Ahoa breached the Franchise Agreements, Huynh and Sheikh necessarily failed in their obligations. (*See id.* ¶¶ 82–83).

"A guaranty is a collateral promise to answer for the debt or obligation of another." *FDIC v. Univ. Anclote, Inc.*, 764 F.2d 804, 806 (11th Cir. 1985) (citing *Nicolaysen v. Flato*, 204 So. 2d 547, 549 (Fla. 4th DCA 1967)). In Florida, "rules applicable to contracts generally apply to guaranty contracts." *Palm Beach Strategic Income, LP v. 358 1276 Can. Inc.*, No. 08-80186-CIV, 2009 WL 7466346, at *5 (S.D. Fla. Feb. 10, 2009) (citing *Lockheed Martin Corp. v. Galaxis USA, Ltd.*, 222 F. Supp. 2d 1315, 1325 (M.D. Fla. 2002)).

As discussed, Plaintiff satisfies the elements for a breach of contract claim against Ahoa. Because Huynh and Sheikh personally guaranteed all of Ahoa's obligations, they breached their guaranty contracts. Therefore, Plaintiff is entitled to default judgment on Count VI of the Complaint.

### c. Count VII — Breach of Limited License (Against All Defendants)

On March 9, 2010, Plaintiff and Defendants entered into a Limited License Agreement whereby Defendants were allowed to operate the restaurants for a limited time while attempting

to sell them. (*See* Compl. ¶ 44). The Limited License Agreement, through various extensions, terminated on March 31, 2011. (*See id.* ¶ 47).

As discussed under Count V, the Eleventh Circuit in *Vega* outlined three elements for a breach of contract claim. Here, Plaintiff has established all three elements. First, the Limited License Agreement is a contract between BKC and Defendants. (*See id.* ¶ 44). Second, Defendants materially breached this contract by failing to close the restaurants after the Limited License Agreement had expired and by failing to comply with post-termination obligations. (*See id.* ¶¶ 49, 90). Third, Plaintiff was damaged because "Defendants still owe BKC past due amounts under the . . . Limited License [Agreement]." (*Id.* ¶¶ 50, 87–88).

As a result, default judgment against Defendants on Count VII is appropriate.

### B. Relief

#### 1. Injunctive Relief

##### a. Use of BKC's Trademarks

Plaintiff is also entitled to an order enjoining Defendants from infringing any of Plaintiff's federally registered trademarks in the future. (*See* Mot. ¶ 51); 15 U.S.C. § 1116(a). A "plaintiff who seeks a permanent injunction must show (1) it has suffered irreparable injury; (2) remedies at law are inadequate to compensate for that injury; (3) a remedy in equity is warranted in light of balancing the hardships between the plaintiff and defendant; and (4) the public interest would not be disserved by a permanent injunction." *Taverna Opa Trademark Corp. v. Ismail*, No. 08-20776-CIV, 2010 WL 1838384, at *3 (S.D. Fla. May 6, 2010) (citing *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006)). Plaintiff has carried its burden on each of the four factors, and thus, permanent injunctive relief is appropriate.

In trademark cases, "a sufficiently strong showing of likelihood of confusion . . . may by itself constitute a showing of a substantial threat of irreparable harm." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 986 (11th Cir.1995) ("There is no doubt that the continued sale of thousands of pairs of counterfeit jeans would damage LS & Co.'s business reputation and might decrease its legitimate sales."). Here, the Complaint alleges "Defendants have not tendered to BKC or removed all Burger King® signs, logos, menu boards, posters, translights, uniforms, plates, cups, tray liners and other items bearing the BKC Marks, name, symbols and/or slogans." (Compl. ¶ 54). Therefore, consumers will be confused into concluding the restaurants are supervised, sponsored and endorsed by BKC. (*See id.* ¶ 55). The Court agrees.

Plaintiff has no adequate remedy at law so long as Defendants continue to operate the two restaurants because Plaintiff cannot ensure strict quality control over the management and operation of the restaurants. (*See id.* ¶ 58). An award of money damages alone will not cure the injury to Plaintiff's reputation and goodwill that will result if Defendants are allowed to continue operating the restaurants. By contrast, Defendants face no hardship if they are prohibited from the infringement of Plaintiff's trademarks, which is an illegal act. Finally, the public interest supports the interest in the issuance of a permanent injunction against Defendants to prevent consumers from being misled by Defendants' actions. *See Nike, Inc. v. Leslie*, 227 U.S.P.Q. 574, 575 (1985) ("[A]n injunction to enjoin infringing behavior serves the public interest in protecting consumers from such behavior.").

The Court's broad equity powers allow it to fashion injunctive relief necessary to stop the Defendants' infringing activities. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's

equitable powers to remedy past wrongs is broad, for. . . the essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case."); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 724 (1944) ("Equity has power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole.").

Moreover, federal courts routinely grant injunctive relief to franchisors for trademark infringement and unfair competition. *See Agad*, 911 F. Supp. 1499 at 1509–10 (entitling BKC to the entry of a permanent injunction for franchisees' continued unauthorized use of the BKC Marks); *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988) (enjoining the defendant's use of the name "Century" as part of his dba); *Baskin-Robbins Ice Cream Co. v. D&L Ice Cream Co., Inc.*, 576 F. Supp. 1055, 1060 (E.D.N.Y. 1983) (granting a permanent injunction following defendants' continued use of Baskin-Robbins's trademarks after termination of the franchise agreement); *Ky. Fried Chicken Corp. v. Old Ky. Home Fried Chicken, Inc.*, 313 F. Supp. 1096, 1099 (W.D. Ky. 1970) (prohibiting defendant from using the name "Old Kentucky Home Fried Chicken" because it too closely resembled the well-known trademark name, "Kentucky Fried Chicken").

Defendants continue to display the BKC Marks in their Burger King restaurants, long after the Franchise Agreements and Limited License Agreement have expired. Accordingly, the Court may fashion injunctive relief to eliminate the means by which Defendants are conducting their unlawful activities. Ordering the removal and return of all of the BKC Marks or any items associated with the Burger King name, symbols, or slogans from these restaurants is appropriate to achieve this end.

Therefore, the Court grants the injunctive relief sought by Plaintiff.

### b. Non-Compete

In its prayer for relief, Plaintiff seeks "[a]n order enjoining Defendants from operating any hamburger business within a two-mile radius of the Restaurants for a one-year period." (Compl. p. 19; Mot. p. 20). Plaintiff, however, has not attached the Franchise Agreements showing the existence of a non-compete clause, nor has it alleged any facts to suggest such a clause exists. By contrast, the presence of such a clause would give the Court a better basis to conclude an injunction is appropriate. *See Athlete's Foot Brands, LLC v. Turner Phase IV, LLC*, 581 F. Supp. 2d 1250, 1253 (S.D. Fla. 2008) (granting a preliminary injunction because the defendants' inability to sell similar goods within ten miles for a one-year period was not, on the face of the non-compete provision of the franchise agreement, against public policy); *Valpak Direct Mktg. Sys., Inc. v. Hyde*, No. 8:06-CV-347-T-26EAJ, 2007 WL 433365, at *2 (M.D. Fla. Feb. 6, 2007) (issuing a permanent injunction against the defendants after they violated the franchise agreement's two-year non-compete clause). In the absence of any supporting documentation, an injunction enforcing a non-compete provision is not entered.

### 2. Money Damages

### a. Past Due Amounts

Plaintiff alleges Defendants owe BKC $64,048.99 in past due royalties, investment spending and advertising for the consecutive months of October 2010, through September 2011. (*See* Mot. ¶ 65; Decl. of Julie Hammon ¶¶ 11–12). To support this number, Julie Hammon refers the Court to "Ex. 1" to "reflect[] the past due amounts." (Decl. of Julie Hammon ¶¶ 11–12). Exhibit 1, however, is only a breakdown of attorneys' fees and does not explain the $64,048.99 of alleged damages. (*See* Mot. Ex. 1). In fact, nothing in the record demonstrates how Plaintiff has arrived at this number. As a result, a default judgment awarding past due amounts is denied.

### b. Attorneys' Fees

Plaintiff also seeks an award of attorneys' fees and costs pursuant to the Lanham Act. (*See* Compl. p. 19; Mot. ¶¶ 66–67); 15 U.S.C. § 1117(a). The Lanham Act allows an award of attorneys' fees and costs for violations of sections 1125(a), (c), or (d) in "exceptional cases," which the Eleventh Circuit has interpreted to mean cases "where the infringing party acts in a 'malicious,' 'fraudulent,' 'deliberate' or 'willful' manner." *Burger King Corp. v. Pilgrim's Pride Corp.*, 15 F.3d 166, 168 (11th Cir. 1994) (citing H.R. Rep. No. 93-524. 93rd Cong., 1st Sess. (1974)); *see* 15. U.S.C. § 1117(a).

Plaintiff is entitled to attorneys' fees and costs under this statute.[6] Plaintiff has established Defendants have acted willfully by continuing to operate Burger King restaurants despite the expiration of both Franchise Agreements and a Limited License Agreement. Moreover, "an award of attorney[]s['] fees and costs will serve the important functions of deterring future infringements, penalizing Defendants for their unlawful conduct, and compensating Plaintiff for [its] fees and costs." *PetMed*, 336 F. Supp. 2d at 1222.

### c. Other Monetary Amounts

In its Motion, Plaintiff seeks a variety of monetary damages, but never requests an exact numerical amount. For example, Plaintiff seeks "Money damages, plus three times additional actual damages[,]" "[p]unitive damages[,]" "[p]re-judgment interest[,]" "[c]ompensatory damages[,]" and "[m]oney damages for amounts owed." (Mot. p. 20). Plaintiff does not attach a precise dollar-figure to any of these requests. It is futile for the Court to opine on a prayer for monetary relief, generally. Absent a proposed order and proposed final judgment — which the Plaintiff agreed to submit yet has not done so to date (*see id.* ¶ 69) — or supporting

---

[6] Plaintiff has provided a sworn detailed declaration with accompanying documentary evidence indicating the appropriate amount of attorneys' fees and costs is $9,592.90. (*See* Decl. of Nina Greene ¶ 13).

documentation, the Court cannot award Plaintiff other damages. Accordingly, default judgment regarding these amounts is denied.

### IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. The Plaintiff's Motion for Default Final Judgment **[ECF No. 23]** is **GRANTED in part** and **DENIED in part**.

2. The Motion is **GRANTED** with respect to Defendants' liability under Counts I–VII.

3. The Motion is **GRANTED** with respect to permanent injunctive relief.

4. The Motion is **GRANTED** with respect to ordering Defendants to remove and return to BKC all identifying Burger King Marks from the restaurants.

5. The Motion is **GRANTED** with respect to attorneys' fees and costs.

6. The Motion is **DENIED** with respect to Plaintiff's request to enjoin Defendants from working in any hamburger business within a two-mile radius of the restaurants for a one-year period.

7. The Motion is **DENIED** with respect to Plaintiff's general prayers for monetary damages.

The Clerk is directed to mark this case as **CLOSED**. In its October 26, 2011 Motion, Plaintiff indicated it would be submitting a proposed final judgment, but to date it has not done so. (*See* Mot. ¶ 69). Should Plaintiff wish the entry of a final default judgment, it is to submit separately a proposed final judgment, as required by Local Rule 7.1(a)(2) and by the Court's previous instructions. (S*ee* [ECF No. 12]).

Case No. 11-22602-CIV-ALTONAGA/Simonton

**DONE AND ORDERED** in Chambers at Miami, Florida, this 5th day of December, 2011.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record